In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-22-00284-CV

IN THE INTEREST OF A.P.R.

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 20-12-15566-CV**

## MEMORANDUM OPINION

Mother appeals from an order terminating her parental rights to her minor son, "Alan."[1] In her appeal, Mother argues that the evidence presented to the trial court was legally and/or factually insufficient to support the trial court's findings terminating her parental relationship with Alan, including the trial court's best-interest finding.[2] Based on our review of Mother's arguments, we conclude that the

---

[1] We refer to Appellant as "Mother," the child's caregiver as "Aunt," and the child by a pseudonym to protect their identities. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2] The trial court terminated Mother's rights on four predicate grounds, including condition endangerment and conduct endangerment. *See* Tex. Fam. Code

record supports the trial court's findings. Accordingly, we affirm the trial court's order terminating Mother's parental rights.

## I. Background

Mother and Father were never ceremonially married but lived together during 2018 when the child was born until some time in late 2018, when they apparently separated and established parentage in the Title IV-D Court by Order signed on December 18, 2020 (the Acknowledgment of Paternity, signed April 4, 2018, indicated Mother and Father had the same address). It appears from the records before the trial court that Mother and Father lived together for some period of time after the child was born. When Mother and Father ended their relationship, Father and Mother were appointed joint managing conservators, and Father was granted the exclusive right to determine Alan's residence. Approximately three months after the custody order was entered, the Department received a report of "medical neglect" regarding Alan. The report indicated that Alan had not "taken a bath in weeks[,]" that Father's house was so filthy that "a foul odor [could] be smelled from outside of the home[,]" and that Mother and Father were known drug users.

---

Ann. § 161.001(b)(1)(D) and (E). The trial court further found that Mother had constructively abandoned Alan and failed to comply with a court order incorporating the terms of her plan of service. *See id.* § 161.001(b)(1)(N) and (O). Father's parental rights were also terminated, but he did not appeal the termination order.

The Department's investigation revealed that although Alan had a "severe diaper rash" and was somewhat dirty, he appeared happy and outgoing despite being "non-verbal and delayed in speech." This investigation further showed that the interior of Father's home, where Alan was living, was messy, dirty, and infested with flies; Father attributed the flies to an ongoing plumbing repair.

The Department then contacted Mother, who stated that transportation issues prevented her from consistently exercising her visitation privileges with Alan. Mother told the investigator that Father refused to bring her the child for visitation, and other evidence revealed that Mother's sister sometimes picked up Alan for Mother's weekend visitations. Mother also admitted occasional use of illegal drugs.

Due to concern over Alan's safety, the Department removed him from Father's home and placed him with Father's sister's family. The trial began on June 1, 2022, and took place over multiple days. Based on her attorney's representations, Mother knew of the trial dates and times but failed to attend, because she lacked transportation.

The Department caseworkers testified, as did the CASA advocate and Alan's caregiver. The trial court also considered nine exhibits that were admitted at trial without objection, which consisted of: prior temporary orders; a prior child support order establishing parentage and conservatorship; the Family Services Plans; a psychosocial evaluation of Mother; and the Resource Education Center Reports

showing Mother's attendance/progress with the treatment plan. We summarize the evidence below.

## A. Eva Vigh's Testimony

Vigh, the CASA advocate, testified that she spoke to Mother a few times during the pendency of the case, and that she and Department Conservatorship Worker Casey Beals once visited Mother at Mother's apartment. Vigh stated that Mother was living in an apartment with several other people, including Mother's new baby. Vigh testified that while Mother indicated she was comfortable with Alan's placement in his aunt's home, she wished to maintain her parental rights to her son. In Vigh's opinion, it was in Alan's best interest that Mother's parental rights to Alan be terminated, because Alan had been placed in "a stable home[,]" was "bonding with his caregivers," and because Mother had not "shown consistency or effort in completing [her] service plan." She did not elaborate on the ways that Mother was not compliant with her service plan.

## B. Shelby McMinn's Testimony

McMinn was the Department investigator in Alan's case. She described her initial involvement in the investigation, when she visited Father's home after they received a report of "neglectful supervision and physical neglect." When she entered the home, she discovered that it was infested with flies and littered with garbage. McMinn also testified that she detected an "odor also coming from the home[,]"

although she denied noticing any "foul smell" in her affidavit of April 30, 2021. According to McMinn's observations, Alan had not bathed "in a couple of days[,]" had a severe diaper rash, and was nonverbal. She directed Father to see a pediatrician to address the diaper rash and speech delay. Father told McMinn that Mother uses drugs "all the time."

During that initial visit, Father indicated that Mother was unstable and "like[d] to party[.]" Father also indicated that Mother was inconsistent in visiting Alan, and Mother's sister sometimes picked up Alan for his scheduled visits with Mother. Father was escorted to a drug-testing facility in downtown Conroe where he submitted urine and hair samples. The tests were positive for methamphetamines, amphetamines, and marijuana. After McMinn spoke to Father about his drug test results, he told her "I already know that you know[,]" agreed to placement with his family member, and ceased contact with the Department.

## C. Malcolm Stowe's Testimony

Stowe like McMinn, worked as an investigator for the Department. He testified that when he contacted Mother, she was vague about her living arrangements and did not allow him to enter her apartment. Mother acknowledged using illegal drugs, specifically marijuana and Ecstasy, but denied using drugs when Alan was in her care. Mother told Stowe that she had visitation every other week, and that she regularly paid child support. When asked about visitation, Mother told

5

Stowe that particular day her car was not running, so her sister picked up Alan for Mother's scheduled visit.

**D. Casey Beals' Testimony**

Beals, the assigned CPS caseworker, testified regarding the service plans developed for both Mother and Father. Regarding Mother's service plan, Beals testified that although Mother previously provided proof of employment, she failed to furnish proof that she had returned to work following the birth of her new baby in January of 2022. Beals further testified that Mother completed the ordered parenting classes but never provided proof of doing so, and she completed her random drug screens until January of that year, when her new baby was born.

Beals recalled speaking with Mother about her service plan, noting that she ceased working on her plan at about the time she had her second child. Beals said Mother failed to complete the recommendations of the psychologist and failed to complete the Family Service Plan by not re-engaging after her second child was born in January of 2022. In spite of this, Beals continued reaching out to Mother via phone calls and text messages which went unanswered. In Beals' opinion, it was in Alan's best interest to keep Alan in his current placement and terminate Mother's parental rights. Beals based this opinion on information that Alan was doing well in that placement as they were meeting his needs, getting him speech therapy, and he had bonded with his foster family.

## E. Aunt's Testimony

Alan's aunt (Father's sister) is his caregiver. She testified that when Alan first came into her care, he had a "really bad" case of diaper rash, his clothes were too small for him, and he was so dirty that he needed two baths. In contrast, Alan was "doing great" at the time of trial. Aunt acknowledged that Mother had virtual visits with Alan after Mother's car broke down, and that Mother's last visit took place in April of 2022. Aunt stated that Mother tended to call at random times; for that reason, Aunt scheduled Mother's virtual visits for every other Sunday morning, but stated that Mother stopped calling.

According to Aunt, Mother wanted Alan to remain with Aunt. Aunt testified they wanted to adopt Alan and believed it was in Alan's best interest that the rights of both parents be terminated because Mother was "very inconsistent."

## F. Documentary Evidence

The documentary evidence admitted without objection indicated that Mother was diagnosed with "cannabis mild use disorder" and "amphetamine mild use disorder[,]" requiring a supportive outpatient treatment program and random urinalysis. Mother reported that despite a history of using methamphetamines every other weekend, beginning at age eighteen, she has not used methamphetamines in two years. This information conflicts with Father's statements to McMinn that Mother "uses drugs all the time." By March 1, 2022, Mother only completed 21 of

45 sessions required to complete her substance abuse program. The target date for completing the substance abuse program was June 7, 2022. The Parenting Assessment portion of the psychological/social report prepared by the psychologist, Chelsea McCann, indicated that Mother was a medium-level risk for child abuse or neglect. Mother told the psychologist that she visited Alan every week during the time Alan was living with Father.

Father agreed to submit to a Substance Abuse Assessment by the Resource Education Center where he was diagnosed, based upon self-reporting, as having Cannabis Moderate Use Disorder, Amphetamine Mild Use Disorder, and met the criteria for Psycho-Social and Environmental Issues (AXIS IV) based upon his admission of a history of using marijuana to deal with anxiety and sleep issues.

## II. Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005) (citations omitted). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In a factual sufficiency review, the question we must decide is not what we would have found from the evidence had we been seated as the factfinder in the trial. Rather the question is whether from the evidence as a whole the factfinder could "reasonably form a firm belief or conviction about the truth of the [Department's] allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). When conducting a factual-sufficiency review, we "give due deference" to the findings that are based on the direct and circumstantial evidence that was admitted before the factfinder in the trial. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (cleaned up). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id*. In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.,* 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id*. (quoting *In re C.H.*, 89 S.W.3d at 25).  When deciding whether a

9

reasonable trier of fact could have formed a firm belief or conviction that the evidence supports a finding challenged in an appeal, we defer to the factfinder's role as the "'sole arbiter of the witnesses' credibility and demeanor[]'" when the inferences it drew from the evidence before it were reasonable. *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022) (citations omitted). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. In a case tried to the bench, the trial court acts as the factfinder, determines which witnesses are credible, decides what weight to give the testimony, and is free to resolve any inconsistencies that may exist in the testimony. *See Iliff v. Iliff*, 339 S.W.3d 74, 83 (Tex. 2011); *In re N.P.H.*, No. 09-15-00010-CV, 2016 WL 5234599, at *3 (Tex. App.—Beaumont Sept. 22, 2016, no pet.) (mem. op.) ("In a bench trial, the trial court acts as both the factfinder and as the sole judge of the credibility of witnesses.").

### III. Analysis

**A. The Endangerment Findings**

"'[E]ndanger' means to expose to loss or injury[.]" *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs.*

10

*v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); *see also In re J.O.*, No. 09-21-00341-CV, 2022 WL 802559, at *9 (Tex. App.—Beaumont Mar. 17, 2022, pet. denied) (mem. op.). In her first two issues, Mother challenges the sufficiency of the evidence to support termination of her parental rights under sections 161.001(b)(1)(D) and (E) of the Texas Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). We are required to consider the sufficiency of the evidence pursuant to Sections 161.001(b)((D) or (E) if challenged. *See In re N.G.*, 577 S.W.3d 230, 235–36 (Tex. 2019). Mother argues that the evidence is legally and factually insufficient because these sections require Mother's *knowledge* of Alan's endangering living conditions and/or the endangering conduct of Alan's caregiver. Specifically, section D states that in order to terminate Mother's rights, it must be shown that she "*knowingly* placed or *knowingly* allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; section E requires evidence that Mother "engaged in conduct or *knowingly* placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). (emphasis added). "Conduct" includes the parent's failure to act. *See In re T.A.*,

11

No. 12-20-00276-CV, 2021 WL 2182316, at *4 (Tex. App.—Tyler May 28, 2021, pet. denied) (mem. op.).

### 1. Statutory Ground E (Conduct Endangerment)

The evidence shows that during Mother's psychological evaluation, Mother stated that Father was "using drugs and stuff[.]" The trial court as the factfinder could reasonably conclude from this evidence that Mother was aware of Father's illicit drug use and failed to protect Alan from that situation. Despite Mother's knowledge of Father's drug use, however, Mother voluntarily entered into an agreement allowing Alan to live with Father. Likewise, Mother acknowledged to the CPS investigator Stowe that she used illegal drugs, and the records admitted at trial indicated she reported a history of drug use that went back many years. Because a pattern of drug abuse will support a finding of conduct endangering a child, and because Mother "knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[,]" the trial court was justified in finding by clear and convincing evidence that Mother had engaged in conduct endangerment when she agreed to let Alan live with Father. *See Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (explaining that a pattern of drug abuse will support a finding of conduct endangerment even if the child is not physically harmed); *see also In re J.O.*, 2022 WL 802559, at *10 (noting same).

12

We therefore overrule Mother's point as to section E.

## 2. Statutory Ground D (Condition Endangerment)

The unkempt state of Father's home, Alan's living environment, could be considered a condition of endangerment under subsection D. *See In re J.O.*, 2022 WL 802559, at *10 (explaining that unsanitary living conditions may support a finding of condition endangerment). Mother argues that the record contains no evidence that she was aware of the condition of Father's residence. For that reason, Mother contends that the trial court's section D finding cannot stand. We disagree.

Assuming without deciding that Mother was unaware of the state of Father's residence, she knew that Father used illegal drugs, yet agreed to let Alan live with Father. It is therefore reasonable to infer that Mother knew that Father was using these illegal drugs in his residence, thus endangering Alan. *See In re B.M.S.*, 581 S.W.3d 911, 917 (Tex. App.—El Paso 2019, no pet.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards…Evidence of illegal drug use and drug-related criminal activity by a parent supports the conclusion that the children's surroundings are endangering to their physical or emotional well-being.").  The frequency of Mother's contact visits with Alan (weekly or biweekly over a period of a year and a half prior to removal), are a reasonable basis for the factfinder to have established a firm belief or conviction that Mother was aware of the endangering condition in which Alan was

living: specifically, Father's history of illegal drug use that was continuing while Father was in possession of Alan. *See id.* Giving due deference to the trial court's factual findings that Mother knowingly left Alan in endangering conditions or surroundings, we cannot conclude that the trial court lacked a firm belief or conviction that the State's allegations were proved by clear and convincing evidence. *See In re J.F.C.*, 96 S.W.3d at 266. Giving due deference to the trial court's determination of the facts, we therefore overrule Mother's condition endangerment argument.

## B. The Remaining Termination Findings

Because we conclude legally and factually sufficient evidence supports the trial court's termination order under sections D and E, we need not consider Mother's arguments regarding sections N and O. *See* Tex. Fam. Code Ann. § 161.001(b)(1); *In re N.G.*, 577 S.W.3d at 232–33; Tex. R. App. P. 47.1.

## C. Best Interest Finding

In her final issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's determination that terminating her parental rights was in Alan's best interest.

There is a strong presumption that a child's best interest is served by maintaining the child's relationship with his natural parent. Tex. Fam. Code Ann. § 153.131(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a

14

"strong presumption" exists favoring keeping a child with his or her parent). It is also presumed that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." Tex. Fam. Code Ann. § 263.307(a). To reconcile these seemingly contradictory principles, the trial court is afforded "wide latitude in determining the best interests of a minor child." *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (citing *Leithold v. Plass*, 413 S.W.2d 698 (Tex. 1967) (other citations omitted)).

As the reviewing court, we must decide whether the record, when considered as a whole, supports the trial court's best interest finding. *See In re C.H.*, 89 S.W.3d at 28; *In re O.V.*, No. 09-21-00408-CV, 2022 WL 961747, at *7 (Tex. App.—Beaumont Mar. 31, 2022, no pet.) (mem. op.). To make this determination, we consider the non-exclusive factors identified by the Texas Supreme Court in *Holley v. Adams*, to the extent that they apply to the case before us. 544 S.W.2d 367, 371–72 (Tex. 1976).[3] The Department need not present evidence of all of the *Holley*

---

[3] These factors are as follows:

1. the child's desires;
2. the child's current and future physical and emotional needs;
3. the current and future physical and emotional danger to the child;
4. the parenting abilities of the parties seeking custody;
5. the programs available to assist the party seeking custody;
6. the plans for the child by the parties seeking custody;
7. the stability of the home or proposed placement;
8. the parent's acts or omissions that reveal that the existing parent-child relationship is improper; and

factors; strong evidence of one factor relevant to the child's safety will support a best interest finding, while scant evidence of each *Holley* factor will not. *See In re C.H.*, 89 S.W.3d at 27.

The Family Code also identifies several additional factors relevant to a best interest analysis. *See* Tex. Fam. Code Ann. § 263.307(b). These include, among others, (i) whether there is a history of abusive or assaultive conduct by the child's family, (ii) whether there is a history of substance abuse by the child's family, (iii) whether the family is willing and able to seek and complete counseling services, (iv) the parent's willingness and ability to effect positive personal changes within a reasonable period of time, and (v) whether an adequate social support system consisting of extended family and friends is available to the child. *Id.* § 263.307(b)(7), (8), (10), (11), (13).

## 1. Desires of the Child

There was no evidence of Alan's desires regarding his placement. Although the record does contain testimony that he was bonded with Aunt's family, the record also contains evidence that Alan "had a[] relationship with [Mother]." This evidence does not weigh either in favor of or against termination of Mother's parental rights.

---

9. any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

### 2. Physical and Emotional Needs or Danger

Alan continues to have a need for speech therapy. This evidence supports the conclusion that Alan was and is better off in Aunt's care than in Mother's or Father's care because Aunt is better equipped to furnish Alan with this needed therapy. The evidence also established that Aunt was meeting his needs. The best interest standard does not, however, authorize termination of Mother's parental rights simply because Aunt has more resources at her disposal. *See In re C.E.K.*, 214 S.W.3d 492, 498–99 (Tex. App.—Dallas 2006, no pet.).

Regardless of Aunt's resources, Mother allowed Alan to be in the primary possession of Father, a known user of illegal drugs, which demonstrated her indifference to Alan's physical and emotional safety. *See Walker v. Tex. Dept. of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (noting that illicit drug use may support termination because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]"). In addition, the trial court could infer from Mother's failure to continue the drug testing requested by the Department that she had resumed her history of using illegal drugs and would be harmful to Alan. *See In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied). This evidence weighs in favor of termination.

### 3. Parenting Abilities

Mother's service plan states that Mother "does appear to possess appropriate skills and parenting knowledge." Mother's service plan further indicates that she has no known physical or mental health issues that would impede her ability to parent Alan. However, Mother's long history of drug use (which would have begun in 2013, when she was 18 years old) has hindered her ability to parent Alan appropriately. Not only has Mother ignored Father's drug use, she acquiesced in the custody arrangement despite her knowledge of Father's drug use. This evidence calls Mother's parenting abilities into question, and weighs in favor of termination of Mother's parental rights.

### 4. Programs Available

Aunt testified that Alan received speech therapy while in her care, and he would be receiving speech therapy through the school. The record contains no other evidence of programs available to assist Alan; therefore, this factor is neutral as to termination.

### 5. Plans for the Child

Aunt testified that she plans to adopt Alan. Aunt also testified that Mother wished to leave Alan with Aunt, as did Vigh. Vigh further noted that Mother did not wish to lose her parental rights. The evidence established that Aunt planned to continue Alan's speech therapy and enroll him in Pre-K, where he would continue

18

to receive those services, which indicated they were meeting his needs. Beals testified that it would be in Alan's best interest for the parental rights to be terminated and for him to remain with his current caregiver. This factor weighs in favor of termination.

### 6. Stability of the Home

The testimony at trial revealed that Mother had been living in an apartment with several other people, and that this apartment would not accommodate Alan if Mother were to regain custody of Alan. That evidence does not favor awarding Mother physical possession of Alan. The Department established that Mother's home was not hers, and she had no place for Alan in the residence. Accordingly, it could be determined to be inappropriate. Therefore, this factor favors termination of Mother's rights to Alan.

### 7. Improper Parent/Child Relationship

Evidence relevant to this factor, such as Mother's previous drug use, is addressed elsewhere in this opinion. This factor also weighs in favor of termination.

### 8. Parent's Acts/Omissions/Excuses

The trial court found that Mother was indigent. This economic disadvantage might explain Mother's inability to repair her car in order to visit Alan in person and her inability to rent a suitable apartment where she could live with her two children. Without evidence of Mother's financial situation and how it affected her decisions,

19

however, we are unable to conclude that these choices were compelled by her own economic disadvantage. We are instead left with evidence that for whatever reason, Mother was living in an apartment with another family. Because Mother did not provide a suitable home for Alan and allowed him to live with Father despite Father's known illegal drug use, we conclude this factor likewise weighs in favor of termination.

### 9. Overall Assessment of Best Interest

The evidence expressly addressing Alan's best interest consists of Vigh's and Beals' testimony, along with the documentary evidence admitted without objection at trial, that it would be in Alan's best interest to terminate Mother's rights because Mother failed to complete her plan and because Alan had bonded with Aunt's family. The evidence of best interest also includes Aunt's testimony that termination would be in Alan's best interest because Mother's contact with Alan was "very inconsistent."

We also consider evidence of Mother's endangering conduct, as shown by her acquiescence in a custody arrangement that placed Alan with Father, a known illegal drug user. *See In re C.H.*, 89 S.W.3d at 28 (explaining endangering conduct was relevant to best interest analysis). In addition, Dr. McCann's finding that Mother presented a medium risk for child abuse is additional evidence to consider in the overall assessment in light of Mother's substance abuse history since 2013.

Evidence of one *Holley* factor, particularly one relevant to a child's safety, may be sufficient to support a finding that termination is in a child's best interest. *See In re K.F.*, No. 09-21-00078-CV, 2021 WL 3774703, at *6 (Tex. App.—Beaumont Aug. 26, 2021, no pet.) (mem. op.). Moreover, a parent's past performance as a parent is relevant to a determination of present and future ability to provide for a child. *See In re C.H.*, 89 S.W.3d at 28.

We conclude that the evidence is sufficient to have permitted a reasonable trier of fact to form a firm belief or conviction that Alan's best interest was served by terminating Mother's parental rights. Accordingly, we overrule issue five.

## IV. Conclusion

Given the evidence presented at trial through witnesses and all exhibits admitted, we hold a reasonable factfinder could have formed a firm belief or conviction that Mother committed a predicate act under subsections D and E. We further hold that a reasonable factfinder could have formed a firm belief or conviction that terminating Mother's parental rights was in Alan's best interest. We therefore affirm the trial court's order terminating Mother's parental rights.

AFFIRMED.

_____
JAY WRIGHT
Justice

Submitted on November 14, 2022
Opinion Delivered February 9, 2023

Before Horton, Johnson and Wright, JJ.